## HAIR v. WILLIAMS BROS., Inc., et al.
### No. 4357.

Court of Appeal of Louisiana. Second Circuit.
Dec. 16, 1932.

McHenry, Montgomery, Lamkin & Lamkin, of Monroe, for appellants.

Vinson M. Mouser, of Columbia, for appellee.

McGREGOR, J.

This is a suit brought by the plaintiff under the Employer's Liability Law (Act No. 20 of 1914, as amended). Williams Bros., Incorporated, a corporation organized under the laws of the state of Nevada, was carrying on the job of building and constructing a gas pipe line in and through certain parishes in northeast Louisiana during the year 1930. In the conduct of this work motor trucks were used for hauling material, machinery, and equipment. During the summer and fall of 1929 the said Williams Bros., Incorporated, employed Dunn Bros. Construction Company to construct a portion of this pipe line in East Carroll parish in the capacity of an independent contractor. The plaintiff was employed by the said Dunn Bros. Construction Company to drive, operate, and repair motor trucks and to perform such other labor in connection with the construction of the pipe line as might be required, all for a daily wage of $6 per day, or $42 per week of seven days.

During the period covering the employment of the plaintiff, Williams Bros., Incorporated, carried employer's liability insurance covering all employees working on said line, with the Georgia Casualty Company. Subsequently, this casualty company merged with, and became a part of, the Public Indemnity Company, a corporation organized under the laws of and domiciled in the state of New York, and the said Public Indemnity Company assumed all of the obligations of the said Georgia Casualty Company arising out of, and in connection with, its insurance business in the state of Louisiana, particularly its obligation in connection with the workmen's compensation insurance issued by it on account of the employees working on the construction of the said pipe line.

On or about July 30, 1929, while performing duties in the regular course of his employment, and while lifting a heavy piece of machinery, the plaintiff fell and struck his side and back on the running board of a truck.

Plaintiff was sent by his foreman to Dr. Brown, the defendants' physician in Lake Providence, and Dr. Brown, seeing the seriousness of the plaintiff's injury, sent him to Monroe where he was treated by the company physician, Dr. George W. Wright.

The pain and disability resulting from the plaintiff's injury developed to such an extent that he was kept in bed practically all the time until November 12, 1929, when an operation was performed on him by Dr. Wright, who had been treating him from the beginning. An incision nine inches in length was made in the region of the right kidney. Upon making this incision Dr. Wright found that plaintiff's right kidney had been dislocated by the fall on July 30, 1929, and had adhered to tissues in the lower abdominal cavity. The kidney was lifted up and sutured at the proper place and the lacerated parts were repaired as well as could be done. Naturally this serious operation kept the plaintiff confined to his bed for quite a while and it was many weeks before he regained any strength or health at all.

Since the operation there has appeared a kind of knot or tumor on the plaintiff's right side, which appears to come and go. In fact, some of the physicians who testified in the case were never able to detect it at all, while others say they have seen it very pronounced at times.

There could be no doubt as to plaintiff's total disability for several months or longer, so compensation at the maximum rate of $20 per week was paid to him for a period of 109 weeks. At the end of that time the defendants refused to pay any more for the reason, as they alleged, that the plaintiff had fully recovered from the injury received, and that, if he was still suffering, it was on account of something that did not arise out of, and which had no connection with, the injury.

On account of the refusal to pay any further compensation, the plaintiff filed this suit against Williams Bros., Incorporated, Georgia Casualty Company, and the Public Indemnity Company, and demand is made for compensation on the basis of permanent total disability for a period of 400 weeks less, of course, the 109 weeks already paid.

In their answer the defendants admit the

injury and temporary total disability, and that the operation was performed as alleged. But they allege that they discontinued paying compensation to the plaintiff for the reason that on and after September 1, 1931, he was able to do and perform the same kind and class of work that he was performing at the time of his injury.

On the issues as thus joined there was a trial in the lower court, resulting in a judgment in favor of the plaintiff for full compensation for permanent total disability. From that judgment the defendants have appealed.

### Opinion.

The only controversy in the case is as to the condition of the plaintiff at the time of the trial, for it will be conceded that his condition at that time was the same that it was when the defendants ceased the payments of compensation.

In his own testimony the plaintiff testified that he has sharp pains in his right side constantly and that his back gives him trouble at varying intervals. The pain in his right side is connected more or less with a lump or knot that appears in that region. The controversy among the expert witnesses revolves around this peculiar phenomenon. The plaintiff says that this swelling or whatever it may be termed made its first appearance immediately after he recovered from the operation when his right kidney was sutured to its proper position in his body. In describing it he says: "It will go and come just like when you blow up a balloon and let the air out of it."

On the day of the trial it was impossible to demonstrate the presence of the formation, but that fact does not cause us to doubt its existence, as three reputable physicians testified that they had seen* it on several occasions. The fact that it was not'palpable on the day of the trial simply corroborates the statement of the plaintiff and his expert witnesses that it goes and comes at different times. It is nothing uncommon for the very worst symptoms to disappear by the time a physician arrives in response to a call from a patient.

Dr. L. A. Masterson, of Columbia, testified that he examined the plaintiff about four times. The first examination was on October 2, 1931, and the last was on March 7, 1932, just two days before the trial of the case. In his testimony he stated positively that the mass or knot was plainly discernible. On this point he said: "The man was complaining of pain in his right side, and complained of a mass in the right side. On physical examination—on October 2nd, 1931, he showed a mass in his right side, this mass was located about halfway between the anterior of the Ileum and the Navel, back here (indicating) on

pressure it seemed rigid, movable and not attached to the interior wall. The mass was about 2½ inches by three inches, more or less oval in shape. Now this mass was present when the man was sitting or standing and on laying down it disappeared. On my examination on March 7th, 1932, Monday, this mass was found in the same region that I have described, but larger. Again it disappeared when the man was reclining or laying down. It was spongy in consistency and was oval and was not attached to the interior wall."

It is the opinion of Dr. Masterson that this abnormal condition was caused by the accident and that it is what is known as an interabdominal hernia. Experts for the defendants incline to the idea that the pain in plaintiff's side complained of indicates chronic appendicitis, but Dr. Masterson stated positively that he saw nothing in his examination to indicate this. It was also his opinion at the time of the trial that the plaintiff is incapable of performing any manual labor whatever.

Dr. George W. Wright of Monroe, the physician who treated the plaintiff for several months immediately following the accident, and who performed the kidney operation, is absolutely positive of the existence of the knot or lump and thinks that it was either caused by and at the time of the accident or was a consequence of it. He sees no connection between this knot or tumor and chronic appendicitis. It is also his opinion that the plaintiff is unable to do any work of a reasonable character.

Dr. W. L. Bendel, an associate of Dr. Wright, was another of plaintiff's medical experts. He examined the plaintiff only once, on February 19, 1932, a short time before the trial. He easily found the knot or lump in plaintiff's side and designated it as a phantom tumor and said that he thought it was an interabdominal hernia. He is of the firm conviction that the tumor was caused by the accident and has no connection with any condition of chronic appendicitis. He also says that the plaintiff is incapacitated to do work of any reasonable character.

In addition to the testimony of these three physicians, there were several lay witnesses who testified as to the general physical condition of the plaintiff and they all agree that, prior to the accident, he was a robust, able-bodied man, and that, since the accident and at the time of the trial, he was not the man that he used to be, and that in their opinion he was not able to do any work of a reasonable character.

Opposed to the evidence produced in behalf of the plaintiff, the defendants called as witnesses in their behalf Drs. J. Q. Graves, J. G. Snelling, and R. W. O'Donnell, physicians and surgeons, and also Dr. D. M.

Moore, a roentgenologist of Monroe. None of these four experts were ever able to discover or discern the lump or knot or tumorfaction which the plaintiff's witnesses found, but it was their uniform opinion that the pain complained of by the plaintiff was attributable to a condition of chronic appendicitis, and that this condition has no causal connection with the accident or injury. Under their testimony, if correct, it could not be held that, at the time of the trial, plaintiff was suffering disability growing out of the accident.

In the consideration of the testimony in this case we are confronted with the same situation that exists in many of the compensation cases that come before the courts. We have the very highest regard for all the medical experts who appeared as witnesses on both sides. It is true that those who appeared for the defendants say that they were unable to find the mass in plaintiff's side which three physicians testifying for the plaintiff say they plainly saw. It will be remembered that the plaintiff's experts said definitely that this so-called interabdominal hernia comes and goes and that at times it is not at all discernible. So the fact that the defendants' experts at the times that they examined the plaintiff failed to find or discern the mass in plaintiff's body does not convince us of its nonexistence.

We are bound to believe the experts in their statement. It is quite likely, then, that those physicians who never saw the mass at all happened to examine the plaintiff at times when it could not be discerned. On the other hand, the defendants' experts say that they find the plaintiff suffering from chronic appendicitis, while his own experts say that the mass which they find is not appendicitis. We think it is likely that both sides are correct. We have often remarked in our opinions in this court that positive testimony is far more convincing than negative testimony, and that rule applies with peculiar force in this case. Plaintiff's experts say positively that the interabdominal hernia exists and that it is causing pain and disability. The defendants' experts say positively that they have never seen or discerned any mass or lump in plaintiff's side, but that they have found evidences of chronic appendicitis. We are inclined to believe both. Neither the hernia nor the appendicitis was discovered until after the kidney operation, though one or both may have existed. The extreme pain caused by the dislocated kidney prevented the plaintiff from noticing or complaining of any other symptom, but as soon as he got relief from the extreme pain and suffering through the operation he discovered that he still had a bad condition in his side and that condition is what has caused the difference between the experts.

Before plaintiff fell and hurt his side or back and dislocated his kidney he was an able-bodied man. Since then he has been unable to do any kind of work. Regardless of the fact that there is such a wide difference among the experts as to plaintiff's condition and the causal connection between that condition and the injury, the fact remains that no intervening cause for his present condition has ever been suggested. Every symptom that has manifested itself has developed and followed in perfect sequence since the accident, and the only logical conclusion is that the entire condition is due to, and has grown out of, the injury. We have no expert knowledge of these matters ourselves, and those who are experts differ as seriously as untrained laymen.

Plaintiff may have had chronic appendicitis before the injury, but if he did he was unaware of it and it did not affect his ability to perform manual labor. Since the accident he has been disabled and, if it is on account of chronic appendicitis, it is evident that that condition was aggravated and accentuated by the accident.

The testimony of all the witnesses taken together and his own observation of the plaintiff and his demeanor convinced the judge of the lower court that at the time of the trial plaintiff was totally disabled and that this disability was caused from the accident. In this conclusion we find no manifest error. On the contrary, we find that the testimony sustains his conclusion and that it is, therefore, correct.

For these reasons the judgment appealed from is affirmed, with all costs to be paid by the defendants.